IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **DANIEL SANCHEZ,** | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE TO DANIEL SANCHEZ'S MOTION FOR JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, A NEW TRIAL (DOC. 2408)**

The United States of America responds to Defendant Daniel Sanchez's Motion for Judgment of Acquittal or in the Alternative, A New Trial, Doc. 2408, as set forth below.

**I.    Procedural History**

Daniel Sanchez proceeded to trial with co-defendants Anthony Ray Baca, Carlos Herrera, and Rudy Perez on January 29, 2018.    The trial was completed on March 5, 2018.  Following the close of the government's case, the Court heard Daniel Sanchez's oral motion for judgment of acquittal.  The Court denied the motion.  On March 12, 2018, the jury returned verdicts finding Daniel Sanchez guilty of Counts 6 and 7.

**II.    Relevant Law**

Rule 29—Motion for Judgment of Acquittal

The appellate court reviews a district court's decision to grant a motion for judgment of acquittal *de novo. See United States v. Jackson*, 213 F.3d 1269, 1283 (10th Cir. 2000).  The Tenth Circuit Court of Appeals has previously spelled out the standard of review of a grant of a motion for acquittal: "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the

credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States v. White*, 673 F.2d 299, 301-02 (10th Cir. 1982), *United States v. Downen*, 496 F.2d 314, 318 (10th Cir.), *cert denied*, 419 U.S. 897 (1974), *Goff v. United States*, 446 F.2d 623, 624 (10th Cir. 1971).

Under this standard courts recognize the right of the jury to determine credibility and to find the facts. *White,* 673 F.2d at 301. The district court should enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. *Id.* If the government has met that standard, both the appellate court and the trial court must defer to the jury's verdict of guilty. *Id.* at 302. This standard is based upon a deep respect for the fact-finding function of the jury. *Id.*

Rule 33—Motion for a New Trial

In considering a motion for new trial, the court has broad discretion. *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir.1987) (citation omitted). The standards for granting a new trial are not as strict as the standards for granting a judgment of acquittal. Federal Rule of Criminal Procedure 33 provides that a court may grant a new trial "if the interest of justice so requires." The court may weigh the evidence and assess witness credibility. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir.1999) (citation omitted). A new trial is warranted if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.' " *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir.1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir.1994)). But courts disfavor new trials, *United States v. Gleeson*, 411 F.2d 109 1, 1093 (10th Cir.1969) (citation omitted), and exercise great caution in granting them, *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir.1997) (citation omitted).

There are, of course, exceptions to the standard for certain claims. For example, a sufficiency of the evidence challenge, whether pursued under Rule 29 as a motion for judgment of acquittal or a Rule 33 request for new trial are adjudicated under the same standard. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015).

> "We review a sufficiency of the evidence challenge de novo, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Hale,* 762 F.3d 1214, 1222 (10th Cir.2014) (quotations omitted). "We will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 1222–23 (quotations omitted). In other words, we ask whether "a reasonable jury could find the defendant guilty." *United States v. King,* 632 F.3d 646, 650 (10th Cir.2011) (quotations omitted). "In conducting this review we may neither weigh conflicting evidence nor consider the credibility of witnesses. It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *United States v. McKissick,* 204 F.3d 1282, 1289–90 (10th Cir.2000) (quotations and citation omitted). That is, "we owe considerable deference to the jury's verdict." *United States v. Mullins,* 613 F.3d 1273, 1280 (10th Cir.2010).

*Dewberry*, 790 F.3d at 1028.

The defendant contends he is entitled to a new trial because the verdict was contrary to the weight of the evidence.  The Court is free to weigh the evidence and assess the credibility of witnesses in considering the defendant's Rule 33 motion.  *See United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 2009) (citing *Tibbs v. Florida*, 457 U.S. 31, 37-38 and n.11 (1982); *see also United States v. Gabaldon*, 91 F.3d 91, 93 (10th Cir. 1996).  As noted by the Tenth Circuit in *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009), "we doubt that we could ever find an abuse of discretion by the district court in denying a new trial based on the weight of the evidence when the evidence was sufficient to support the verdict.  We note that courts of appeals routinely affirm the denial of such new-trial motions once they have upheld the sufficiency of the evidence." (Citing *United States v. Rodriguez*, 457 F.3d 109, 118-19 (1st Cir.

2006); *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008); *United States v. LeGrand*, 468 F.3d 1077, 1080 (8th Cir. 2006); *United States v. Hunt*, 526 F.3d 739, 744 n.1 (11th Cir. 2008).

When the Court reviews the evidence, including evidence and the transcripts, the Court will find there is no basis for concluding that the verdict is contrary to the weight of the evidence. This is especially true in light of the defendant's admissions and the other evidence presented at trial. The jury did not improperly weigh the evidence, *see Cesareo-Ayala*, 576, F.3d at 1126, such that a miscarriage of justice occurred, and thus the defendant is not entitled to a new trial on this basis.

## III.   Argument

### a. The Court should again deny the defendant's motion for judgment of acquittal

The Court denied the defendant's Rule 29 motion at trial and should do so again now. There was an overwhelming amount of evidence the jury could assess in finding the defendant guilty. This is true despite the defendant's claim that "[i]f the government's accomplice/informants' paperwork story fails to prove Mr. Sanchez's guilt beyond a reasonable doubt to a rational, logical fact-finder then Mr. Sanchez's convictions cannot legitimately stand." Doc. 2408, at 25.

Not only could the jury find the defendant guilty based on the testimony about the paperwork calling for Javier Molina's murder, the jury could find him guilty based on the uncontroverted testimony that the defendant was the "llavero" for the blue pod where Molina lived. Witnesses like Billy Cordova and Jake Armijo explained to the jury that it was the llavero's job to enforce orders to assault and murder people. Jake Armijo testified that he would have had to enforce the order himself had he seen the paperwork while he was living at the Southern New Mexico Correctional Facility ("SNMCF"). The jury easily could have concluded

that the defendant oversaw and called for the Molina murder because it was his duty to do so as an SNM leader.  These facts alone are sufficient to sustain the guilty verdicts.  The district court should enter a judgment of acquittal only if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt. *White* 673 F.2d at 301.  That simply is not the case here, especially considering the testimony of witnesses who directly implicated the defendant:  Billy Cordova, Timothy Martinez, Mario Rodriguez, Jerry Montoya, and Jerry Armenta.

Furthermore, the defendant himself concedes a number of points that are sufficient to overcome his Rule 29 motion.  He admits that Rudy Perez's statements to Cordova that he knew David Calbert caused the paperwork to be sent to SNMCF corroborated the testimony of other witnesses.  Doc. 2408, at 32.  He admits that Perez corroborated other witnesses' testimony that Molina could not be murdered until someone produced the paperwork.  *Id.*  He admits there was corroboration about Perez providing a piece of his walker to be made into shanks.  *Id.*  He admits Perez's statements corroborated other witnesses' claims that he organized the murder.  *Id.* at 32-33.  He admits that Herrera's admission that the paperwork was real corroborated the testimony of other witnesses.  *Id.* at 33.

The defendant also asserts that prison records controverted witness testimony about such things as Urquizo's property and when it was inventoried.  The problem with that claim is that the records themselves were unreliable as demonstrated by the examination of James Brewster. In fact, there was such a problem with the records that defense counsel failed to introduce them as business records (Rule 803(6)), instead relying on another rule of evidence related to an interest in property (Rule 803(15)).  Tr. 2/26/18 – 2/27/18 (The Court:  "Well I'm not convinced that it meets some of the standards given Mr. Brewster's testimony. . .).  This argument falls flat,

especially when weighed against the standard set by Rule 29. "We must view the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, determine whether that evidence, if believed, would establish each element of the crime." *United States v. White*, 673 F.2d 299, 301-02 (10th Cir. 1982), *United States v. Downen*, 496 F.2d 314, 318 (10th Cir.), *cert denied*, 419 U.S. 897 (1974), *Goff v. United States*, 446 F.2d 623, 624 (10th Cir. 1971). The Court should again deny the defendant's Rule 29 motion.

### b.  The Court should deny the defendant's motion for a new trial

The defendant makes a number of claims in support of his motion for new trial. One claim is that the jury's verdict is contrary to the weight of the evidence. Doc. 2408, at 13. And though some cases indicate the Court "may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred," *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994), other cases have disagreed with this approach. *See State v. Atkins*, 786 S.W.2d 642, 645 (1990) (*quoting State v. Johnson*, 692 S.W.2d 412, 413 (Tenn. 1985):

> The distinction between the 'weight' of the evidence and the 'legal sufficiency' of the evidence has little substance in criminal cases, where the State has the burden of proving the defendant's guilt beyond a reasonable doubt. It is difficult to accept the proposition that a trial judge can reasonably determine that the evidence is legally sufficient to support a finding of guilt beyond a reasonable doubt but that such a verdict is against the weight of the evidence. We find the weight of the evidence standard to be difficult, if not impossible, to apply rationally and uniformly in criminal cases.

Furthermore, motions for new trials are "regarded with disfavor and should only be granted with great caution." *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). Courts disfavor new trials, *United States v. Gleeson*, 411 F.2d 109 1, 1093 (10th Cir.1969)

(citation omitted), and exercise great caution in granting them, *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir.1997) (citation omitted).

A good portion of the defendant's arguments focus on the testimony of cooperating witnesses and allegations that their testimony was unreliable. Those witnesses include Mario Rodriguez, Timothy Martinez, Jerry Armenta, and Jerry Montoya, David Calbert, Lupe Urquizo, and Billy Cordova. Doc. 2408, at 16-21. The defendant in *United States v. Dewberry*, 790 F.3d 1022 (10th Cir. 2015) made similar claims about cooperating witnesses. Overall, the appellate court "will not reverse a conviction merely because the verdict was grounded on the uncorroborated testimony of a coconspirator." *Dewberry*, 790 F3d. at 1029 (*quoting United States v. Ivy*, 83 F.3d 1266, 1284 (10th Cir. 1996) and citing *United States v. Magallanez*, 408 F.3d 672, 682 (10th Cir. 2005) ("A conviction may stand merely on the uncorroborated testimony of an accomplice.")) The defendant's problem is that a great deal of the testimony was corroborated, leading to additional challenges to him prevailing on his motion.

Moreover, "credibility challenges are generally disfavored." *Dewberry*, 790 F.3d at 1029. "It is not our function to assess the credibility of the witnesses on appeal; that task is reserved for the jury." *Id.* (quoting *United States v. Fox*, 902 F.2d 1508, 1515 (10th Cir. 1990) (internal quotes omitted). The Tenth Circuit "will not hold the testimony is, as a matter of law, incredible unless it is unbelievable on its face, i.e., testimony as to facts that [the witness] physically could not have observed or events that could not have occurred under the laws of nature." *Dewberry*, 790 F.3d at 1029 (*quoting United States v. Mendez-Zamora*, 296 F.3d 1013, 1018 (10th Cir. 2002) (internal quotes omitted).

Understandably, the defendant is not seeking the appellate standard for witness credibility challenges, because that is a standard he cannot overcome. He is instead asking this Court to

serve as a thirteenth juror who he asks to overrule the trial jury's unanimous verdict.  But this Court should avoid taking the bait, both because such challenges are disfavored and because the cooperating witness testimony in this case was truthful, reliable, and supported by other evidence.  The Rule 29 standard is based upon a deep respect for the fact-finding function of the jury.  *White,* 673 F.2d at 302.  This Court should deny the Rule 33 motion for the same reason and not grant a new trial in light of the jury's verdicts.

> ### c.  Recorded statements and admissions of Rudy Perez and Carlos Herrera were properly admitted and used against them in a joint trial

The defendant argues as part of his Rule 29 motion that cooperator testimony at trial was uncorroborated.  On the other hand, he argues as part of his Rule 33 motion that recorded statements introduced at trial provided evidence that was "powerfully incriminating," especially because it  corroborated the testimony of cooperating witnesses.  Doc. 2408, at 30, 32.  He further argues the statements were "inadmissible" at a joint trial that included him.[1]  *See* Doc. 2408, at 32-33.  The Court can deny this basis for the defendant's new trial request, as it should, unless the Court is willing to reconsider its ruling on the admissibility of the recorded statements of Perez and Herrera.  The Court's refusal to reverse itself is the only basis necessary to deny granting a new trial as to this part of the defendant's argument.

Not only did the Court properly rule the recorded statements admissible at trial, Doc. 1882, at 63-64, 124, the Court appropriately gave limiting instructions to the jury directing them to use the statements only against the statements' declarants.  One example is the instruction the Court gave to the jury on February 14, 2018 during Gerald Archuleta's testimony:

---

[1]  The defendant filed pretrial pleadings arguing that the statements consisted of inadmissible, testimonial hearsay in an attempt to challenge their admissibility.  *See* Docs. 1616, 1665.  Clearly, the defendant placed quotation marks around the word "inadmissible" as a means of communicating to the Court his disapproval of the Court's ruling that the statements in the recordings were admissible.  The United States previously argued and maintains the statements were admissible as non-testimonial statements against all defendants pursuant to *United States v. Smalls,* 605 F.3d 765 (10th Cir. 2010)).

> [T]hese are going to be recordings that Mr. Archuleta made of Mr. Herrera
> talking, *so you can use these in your consideration of the charges against Mr.*
> *Herrera.  But you can't use them against anyone else*.  And so if you're taking
> notes, there's going to be a number of these played.  You might want to really
> note these.  *These can only be considered as to Mr. Herrera, and not the other*
> *three gentlemen*.

Gerald Archuleta, 2/14/18 Tr. at 88 (emphasis added) *See* Gerald Archuleta's Tr., attached as

Exhibit 1.  The Court gave similar instructions to the jury during Billy Cordova's testimony on

February 22 and 23, 2018.  For example, when Exhibit 198 was introduced, the Court instructed

as follows:  "And I think this is a conversation with Mr. Herrera.  So it can only be used in your

deliberations as to the charges against Mr. Herrera and not as to the other three gentlemen."

Billy Cordova, 2/22/18 Tr. at 176. *See* Billy Cordova's Tr., attached as Exhibit 2.  The Court

instructed the jury similarly for the other recordings.  In fact, the record is riddled with limiting

instructions.  It would be difficult to find a place in the record where the Court denied a limiting

instruction requested by a defendant, especially when the instruction dealt with admissions to be

used only against the declarant.

Finally, the United States agreed to redact the recordings and transcripts at trial in order

to avoid a two-jury scenario.  *See* Doc. 1712, United States' Sealed Motion to Reconsider the

Court's Two Jury Proposal.  Contrary to the defendant's claim that the admissions of Perez and

Herrera "directly incriminated Mr. Sanchez," Doc. 2408, at 29, the redactions removed any

mention of the co-defendants against whom the admissions were not being used.  For example,

the names of defendants Baca, Perez, and Sanchez were redacted from Herrera's statements, and

the names of Baca, Herrera, and Sanchez were removed from Perez's statements. *See*

Government's Exhibit 215, attached as Exhibit 3. The recordings were likewise redacted.

Finally, the defendants benefitted from additional redactions when they made eleventh-hour

requests for those redactions.  For example, Baca requested that his mention of the ADX prison facility be redacted because he believed his discussions about the facility would prejudice him.

Perez's statements made directly to law enforcement were also properly admitted against him at trial.  Related to this argument, the defendant asserts that statements by Perez's attorneys prejudiced him.  However, statements, arguments, objections, and questions by counsel are not evidence.  *See* Court's Final Jury Instructions, Doc. 1877, Instruction 4.  In addition, the defendant did not object to Perez's opening statement, so the Court should review that claim for plain error.  "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects [the defendant's] substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Caraway*, 534 F.3d 1290, 1298 (10th Cir. 2008) (internal quotation marks omitted).  The defendant bears the burden of establishing all four elements of plain error.  *See United States v. Gonzales*, 558 F.3d 1193, 1199 (10th Cir. 2009).  In addition to overcoming the weight of the evidence standard, the defendant must establish the four elements of plain error.  This he cannot do.

In addition, even though Perez made many attempts to introduce his own self-serving hearsay statements, the other defendants and the United States routinely objected to Perez's attempts to do so.  The Court also took steps to keep out the inadmissible evidence.  The Court, at one time, told Mr. Villa, "I think in a theoretical academic sense I agree with you, and so do the scholars.  But the case law is decidedly against you on this."  Antonio Palomares, 2/2/18 Tr. at 90. *See* Antonio Palomares Tr., attached as Exhibit 4.  The Court later stated, "Mr. Villa, I've ruled that this is inadmissible, so don't try to bring it up in front of the jury without approaching the bench." *Id*. at 93. *See* Exhibit 4.  And even though questions are not evidence, the Court at one point also struck one of Perez's questions:  "I'm not going to permit the answer to the

question that Mr. Villa started.  If you caught any of it before all the objections were made, I strike the question, as well.  So don't even consider the question, which is not what you should be doing anyway."  *Id.* at 95. *See* Exhibit 4.

As for the rest of Perez's statements admitted at trial, the Court properly admitted them against him.  These statements focused on Perez and what he said or did and were often accompanied by limiting instructions:  "Ladies and gentlemen, these statements that Mr. Palomares is reciting that Mr. Perez made can only be used against Mr. Perez.  They can't be used against any of the other three gentlemen in the courtroom.  So it can only be used in your deliberations about Mr. Perez."  *Id.* at 83. *See* Exhibit 4. Consequently, the Court should deny the request for a new trial on these bases.

### d.  The government did not intentionally suppress material, favorable evidence

The defendant contends that the prosecution violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1967).  But the United States did not violate *Brady*, because the information disclosed is cumulative, is not exculpatory, and is not material. Moreover, even if there was a *Brady* violation, which there was not, the defendants are not entitled to a remedy, because they cannot articulate any prejudice the delay caused. Moreover, the disclosure of this cumulative and not-exculpatory information during the case, before the defendants closed their case-in-chief, and during which time the United States noted it would not oppose the defendants recalling any witnesses whom they wished and whom the United States would make available does not prejudice the defendants. Thus, there hasn't been any *Brady* violation, and the defendants aren't entitled to any remedy.

The defendant dedicates a good portion of his motion arguing for a new trial based on an FBI 302 and interview notes related to Lupe Urquizo which he claims contained exculpatory

material.  Doc. 2408, at 35-44.  That information was not untimely, was not exculpatory, and was

not material, as previously briefed by the government.  *See* Doc. 1850.

Urquizo testified on February 6 and 7, 2018.  Doc. 1850, at 2.  Among other things, he

testified that he and others agreed to put a hit on Daniel Sanchez because "all this wouldn't have

happened if 'Dan Dan' Sanchez would have did his job and his job was to cover the [camera]

and he didn't do his job."  *Id.* at 3.  This testimony was consistent with Urquizo's prior

statements to the FBI, including the statement of which the defendant complains.[2]  The

testimony was also consistent with the testimony of cooperators who talked about the hit placed

on the defendant.[3]

The information in the January 22 notes ("Jan. 22 Notes") which the defendant claims is

exculpatory is not in any way exculpatory.  The defendant possessed all of the information on

which his motion for new trial (and previously motion to dismiss) is based weeks before trial, as

it is contained in the original and principal debrief of Urquizo in a March 6, 2017 debrief report

("Mar. 6 302").  *See* Urquizo January 22 Notes, attached as Exhibit 9 and Urquizo Mar. 6, 2017

FBI 302, attached as Exhibit 10.

Defendant Sanchez contends that there was a *Brady* violation in not disclosing the

Urquizo Jan. 22 Notes based on four statements. First, that "Mario Rodriguez passed Urquizo a

note under the door, that stated his desire to have Timothy Martinez, Jerry Armenta and Jerry

Montoya do the hit."  Doc. 2408, at 36.  The Urquizo Jan. 22 Notes don't say that. They say that

the note "stated *the* desire to have Timothy MARTINEZ, Jerry MONTOYA and Jerry

---

[2] The defendant often extracts a portion of a statement from Agent Sainato's notes taken during a January 22, 2018 debrief of Urquizo in support of his request for a new trial (and previously for dismissal) as follows:  others conspired to murder Sanchez because he "**did not participate in the homicide.**"  Doc. 2408, at 30, 54.  The more complete statement reads as follows:  SNM members "talked about hitting Daniel SANCHEZ because he did not participate in the MOLINA homicide or even cover the camera **like he was supposed to.**"  (emphasis added).
[3] *See* Lupe Urquizo, 2/5/18 Tr. at 55-59, attached as Exhibit 5, *See* Roy Martinez, 2/16/18 Tr. at 69-70 and 183-189, attached as Exhibits 6 and 7, *See* Billy Cordova, 2/23/18 Tr. at 265-272, attached as Exhibit 8.

ARMENTA do the hit on MOLINA." Urquizo Jan. 22 Notes at 3 (emphasis added). This aligns with Urquizo's Mar. 6 302 that says: "RODRIGUEZ then wrote URQUIZO a letter and sent it to him under the door. RODRIGUEZ said that he and SANCHEZ were gonna have the pod move on MOLINA." Mar. 6 302, at 3, Bates 43640. Certainly, if Defendant Sanchez cross-examined Urquizo about what it meant that the letter "stated *the* desire" to have Martinez, Montoya and Armenta do the hit on Molina, either Urquizo would've said that the letter said Rodriguez and Sanchez were going to have Martinez, Montoya and Armenta do the hit, or it would've been elicited from Urquizo on re-direct. That's what Urquizo had said all along. Thus, that the Urquizo 302 Notes don't fully explain what "the" means isn't exculpatory, and it certainly isn't "material" under *Brady*.

Second, Sanchez claims that the notes are exculpatory because "Rodriguez said that Montoya, Armenta and Martinez were going to be tasked with the hit." Doc. 2408, at 36.  Again, the Urquizo Jan. 22 Notes don't say that. They say the note stated the desire that they'd be tasked with the hit. Moreover, the same analysis above applies; Urquizo would've stated on cross-examination or re-direct that the letter said Rodriguez and Sanchez were going to task Montoya, Armenta and Martinez with the hit. That's was the theory all along, and it's the same theory that was provided in the Mar. 6 302. Moreover, on cross-examination of Rodriguez, Rodriguez was confronted with his trial testimony that Defendant Sanchez wanted Montoya, Armenta and Martinez to do the hit. On cross-examination, Rodriguez was asked whether, since he was a 100% devoted SNM soldier, he wanted the murder to happen and wanted Montoya, Armenta and Martinez to kill Molina. He said yes; that's the mindset he was in as a devoted SNM member. So to whatever use Defendant Sanchez claims he would put this statement in the Urquizo Jan. 22

Notes, he's already put it to that use. He cannot show that any "delay should be regarded as materially prejudicial." *See Burke*, 571 F.3d at 1056.

Third, Defendant Sanchez says that the government's case that he participated in the murder by approving the murder and assigning the others' roles is inconsistent with the statement in the Urquizo Jan. 22 Notes which he contends say that, "[a]fter the murder, Urquizo, Rodriguez, Calbert, Robert Martinez, and Roy Martinez talked about hitting Daniel Sanchez because he did not participate in the homicide or even cover the camera like he was supposed to." Doc. 2408, at 36. (emphasis omitted). Again, this same information was previously disclosed in the Mar. 6 302. The Mar. 6 302 states that "RODRIGUEZ also said, 'Dan screwed up. He was supposed to cover cameras.' . . . . 'Dan was supposed to get Creeper's Shank.'" *Id.*, at 4, at Bates 43641. Moreover, the same Mar. 6 302 states: "SNM called a greenlight on Daniel SANCHEZ after the MOLINA hit because he failed to cover the camera and did not retrieve ARMENTA's shank after the hit." *Id.* The report states that "Leadership within the SNM discussed hitting Ronald SANCHEZ, since they couldn't get to Dan Dan." *Id.* Thus, this information previously was disclosed. Defendant Sanchez cannot show, therefore, that any "delay should be regarded as materially prejudicial," because there was no delay in providing him with this information.[4] *See Burke*, 571 F.3d at 1056.

Fourth, the defendant claims that the notes are exculpatory because they state, Rodriguez sent Urquizo another letter stating that Molina would be hit that afternoon." Doc. 2408, at 36. Once again, the notes do not indicate in any way that Rodriguez ordered the hit to take place that

---

[4] The defendants also have the location histories for each of Urquizo, Rodriguez, Calbert, Robert Martinez and Roy Martinez, which show that they were together when Defendant Sanchez was out of state. They also have numerous reports, both 302s and 1023s, that reflect that Calbert and Urquizo are friends, that Calbert, Urquizo, Rodriguez and Robert Martinez and Roy Martinez are SNM members and even leaders.

afternoon.  This statement is consistent with Daniel Sanchez ordering the hit and Rodriguez conveying the message about when it would take place.

Simply put, there is no *Brady* violation where Defendant Sanchez contends there is one. *Brady* does not depend on the form or means of the information provided; it depends on disclosure of the information. The obligation is to provide the information, not to provide the information in duplicative reports and notes.

Thus, to the extent that Defendant Sanchez contends that the information contained in the suppressed notes of the January 22, 2018 Urquizo interview would have informed the "cross-examination strategy for each and every accomplice/informant claiming Mr. Sanchez participated in the Molina homicide," "his overall trial strategy," and his ability to "timely counter the government's presentation of contrary evidence about why, after the Molina murder, others, including the government's accomplice/informants, wanted to kill Mr. Sanchez,"[5] Doc. 2408, at 42-43, Defendant Sanchez already had that information in the Mar. 6 302, which he does not complain about. Defendant Sanchez had this information. And he had this information in the Jencks disclosure which the United States disclosed before the statutory requirement to disclose it after the witness testifies. He therefore cannot meet the Tenth Circuit's prejudice requirement for any level of a remedy, let alone a new trial.

The defendant alleges that the government "has offered no explanation as to why information that exculpated Mr. Sanchez" was not disclosed and asks "why government prosecutors failed to immediately notify Mr. Sanchez of this exculpatory evidence, in blatant

---

[5] The defendant had previously alleged the January 22 notes would have also informed coordination of defense strategy between all of the four trial defendants and perhaps averted the pursuit of conflicting defenses that he claimed developed at trial in his motion to dismiss.  This argument undermines Carlos Herrera's claim that he was ineffective because he was not prepared for trial.  There was a joint defense agreement and a joint defense at trial, so he was not alone in defending his case.

dereliction of their professional and ethical duties, or why it introduced, and sought to profit from, contrary evidence about discussions to kill Mr. Sanchez after the Molina murder." Doc. 2408, at 37. Part of the answer is addressed above and was addressed thoroughly in the United States' Response to Defendant Daniel Sanchez's Motion to Dismiss Case for Government's Outrageous Misconduct and Irreparable Violation of *Brady v. Maryland*, Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mistr[ia]l based on Repeated Brady and Giglio Violations, and to Defendant Perez's Motion to Dismiss. Doc. 1850. The United States incorporates the fact, law, and arguments from that response for purposes of this response. The information pertaining to Lupe Urquizo was not exculpatory and was previously disclosed in the March 6, 2017 FBI 302 report.

The other part of the answer is that testimony by other government cooperators corroborated Urquizo's version of events. Billy Cordova testified that Mario Rodriguez "was kind of hurt with [Sanchez] because he didn't dispose of the shanks properly after the hit went down." *See* Billy Cordova, 2/22/18 and 2/23/18 Tr. at 265, 272. The transcript clearly establishes the government was attempting to bring in this line of testimony to prove that the defendant was part of the Molina murder conspiracy, ordered the Molina murder, then failed to do his part by refusing to dispose of Jerry Armenta's shank. The defendant claims Billy Cordova's testimony was contrary to Urquizo's statement, but that assertion couldn't be farther from the truth. In fact, it was the defendant who objected to his line of question during trial. *See Id.* "And so this is the discussion from other members about Mr. Sanchez not following through with *part of the plan*." *Id.* (emphasis added). *See* Lupe Urquizo, 2/5/18 Tr. at 55-59, attached as Exhibit 5, *See* Roy Martinez, 2/16/18 Tr. at 69-70 and 183-189, attached as Exhibits 6 and 7, *See* Billy Cordova, 2/23/18 Tr. at 265-272, attached as Exhibit 8.

Finally, in response to the allegation that government prosecutors were "in blatant dereliction of their professional and ethical duties" for not notifying the defendant of exculpatory information, the Court merely needs to look at the resolution of Mauricio Varela's case to see that it was actually Varela for whom Lupe Urquizo provided exculpatory information.[6] Following Urquizo's debrief, the United States still had solid conspiracy evidence against Varela, but a much weaker case against him involving the murder.  Government prosecutors shared that information with Varela, as it was their duty to do, and eventually negotiated a resolution with Varela that resulted in dismissal of Varela from the Molina murder counts.  So, in essence, Urquizo did provide exculpatory information about a defendant, but that defendant was Varela and not Sanchez.

The defendant alludes to last-minute discovery dumps he claims prejudiced him.[7]  One of those sets of disclosures involved 981 pages of materials belonging to Mario Rodriguez discovered under Agent Sainato's desk toward the end of trial.  Agent Stemo quickly inventoried those materials before they were to be returned to the New Mexico Corrections Department ("NMCD").  The result was a mid-trial disclosure to the defendants of the materials.

The defendant previously moved to dismiss the charges against him based on an allegation that the disclosure contained exculpatory information.  *See* Doc. 1841.  The United States reviewed the 981 pages of discovery and explained in its response how the materials were cumulative, not exculpatory, and not material.  *See* Doc. 1850.[8]  Furthermore, the United States

---

[6] The March 6, 2017 FBI 302 of Lupe Urquizo's debrief reflects the following:  "URQUIZO told Mauricio VARELA to shower and get into his house because MOLINA was gonna get hit.  VARELA complied, but was upset that he didn't know all the details.  VARELA complained, "Nobody tells me anything around here."  URQUIZO described VARELA as "wanting to be a leader and thinking he's a leader, but nobody really includes him on anything.  So he was mad."

[7] *See* discovery letters related to the discovery disclosed during trial, attached as Exhibit 11.  Some of the discovery related to Trial 2 and had no relevance to Trial 1.  Other documents were for people who were not trial participants.

[8] The defendant also made a claim of outrageous government conduct, which the United States explained is not a form of relief available to the defendants.  Doc. 1850, at 16, 25-26.

agreed to make available witnesses who had already testified in order for the defendants to conduct further examinations of those witnesses.  The defendants refused the offer.  *See* Doc. 1850, at 1.

The most probative evidence for the defendants from the box of documents found under Agent Sainato's desk was a letter from Rodriguez in which he provided statements about the Molina murder "of my own free will" that were inconsistent with his in-court testimony. But that letter had already been used by the defense. It was used twice.[9] The defendants cross-examined Agent Acee about the document, entered it into evidence, and walked through the letter line-by-line in front of the jury. While they did that, they elicited from Agent Acee line-by-line that the information in the letter was different from Rodriguez's trial testimony. They did the exact same cross-examination a second time with Agent Stemo, changing only that the statements in the letter were different from what Rodriguez told SA Stemo -- as she was excluded from the trial under the rule of exclusion of witnesses.  So the defendants used this letter.  And they used it probably more effectively in this manner, because whereas Rodriguez could have explained both

---

[9] A closer review of the trial record reveals that it was actually used three times.  Defendant's Exhibit FL, admitted during Jerry Montoya's testimony on February 13, 2018, contains the exact same information as the Rodriguez letter found in his property and turned over to the defense on February 25, 2018.  The letter found in Rodriguez's property under Agent Sainato's desk was admitted as Defendant's Exhibit FV on February 26, 2018 during Agent Acee's testimony.  *See* Defendant's Exhibits FL and FV, attached as Exhibits 12 and 13, respectively. Defendant's Exhibit FL was never disclosed to the government by the defense but was apparently in the defense's possession prior to trial.  Hence, Exhibit FV is not material because it was already in the defense's possession.  Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  The trial result would have been the same because the evidence had already been introduced at trial almost two weeks before it was found in Rodriguez's property.  Furthermore, it is "well settled that evidence 'is not considered to have been suppressed within the meaning of the *Brady* doctrine if the defendant or his attorney either knew, or should have known of the essential facts permitting him to take advantage of [that] evidence.'"  *United States v. Torres*, 129 F.3d 710, 717 (10th Cir. 1997) (quoting *United States v. Gonzalez*, 110 F.3d 936, 944 (2d Cir. 1997)).

on cross and on re-direct why he gave those differing statements, neither Agent Stemo nor Agent Acee could provide that rebuttal. Thus, the defendant cannot show that he was prejudiced by the delayed disclosure of this letter.

And it is not as if Rodriguez didn't get impeached. He was impeached several times, on several grounds, by each defendant. Rodriguez was also impeached about the plan to provide the story he gave in the letter when he was asked about Martinez's, Montoya's, and Armenta's plan to create a version of the Molina murder in which only Armenta would take the fall. That plan also was brought out through each of Martinez, Montoya, and Armenta, all of whom included Rodriguez as in on the plan.

For this reason as well, the letter in Rodriguez's property from Martinez's wife regarding Martinez's, Armenta's, and Montoya's stories aligning is cumulative to the information already admitted as evidence in this trial. *See* Herrera Motion to Dismiss, Doc. 1850 at ¶ 8, Motion for New Trial, Doc. 2413 at 9. There is no doubt that there was a plan to tell a false story about the Molina murder in the state case. And since that had been established through Rodriguez, Martinez, Armenta, Montoya, and Agent Acee, it was not lost on the jury.  Again, therefore, the defendant cannot establish prejudice.  This information, as well, is cumulative and, therefore, not material.  *See Burke*, 571 F.3d at 1056 ("Delay [in disclosure] only violates *Brady* when the delay itself causes prejudice.") (quoting *United States v. Patrick*, 965 F.2d 1390, 1400 (6th Cir. 1992)). *See also United States v. Tyndall*, 521 F.3d 877, 882 (8th Cir. 2008) ("A mid-trial disclosure violates *Brady* only if it comes too late for the defense to make use of it.")

The only additional claim the defendant can make is that, given the contents of these documents, counsel would have changed trial strategy, including the cross examination of multiple cooperating witnesses.  But the defendant cannot explain how his trial strategy would

have changed. And it would not have. At most, the defendant may have had a few more documents with which to impeach Rodriguez, but it would not have added to the trial. Rodriguez was impeached extensively, especially by Defendant Perez throughout the trial. At every opportunity, Defendant Perez put Rodriguez's arrest picture in front of the jury and let it hang there long after talking about it.  The defendant, and the other defendants, may contend that Rodriguez's hundreds of handwritten pages which detail assaults, murders and his role within the SNM may have added to the cross-examination,[10] but that contention does not withstand scrutiny. Rodriguez's writings are actually mitigating when compared with the questions elicited about his crimes and the two videos of his Esparza assault (Defendant's Exhibits AK-4 and AK-5) that Defendant Baca played for the jury. Rodriguez's writings explain how he came to the mindset in which he committed these assaults and discussed remorse for the lifestyle that brought him to that mindset. Those are not writings that would've helped the defendant's defense.

Perhaps most telling that the documents in Rodriguez's property would not have changed any defendant's trial strategy, including the cross examination of multiple cooperating witnesses, is that the United States offered to make all cooperators available for the defendants to be recalled to the trial when they filed their motions to dismiss.  Each defendant put on the record that they didn't want to call any of the cooperating witnesses back.  In addition, the United States moved the admission of the entire contents of the box containing Rodriguez's property.  The defendants objected.

The cross-examination of Rodriguez, and the cross-examination of each cooperator, was robust. Each cooperating witness was impeached substantially, several times. The documents in

---

[10] The United States read through the 900+ pages of documents in the Rodriguez file, and the writings about his life, including his assaults, were contained in a composition notebook that spanned dozens of pages, but not hundreds.

Rodriguez's property would not have added anything to those examinations, and, if they were used at all, would not have made any material difference with any witness. Under these circumstances, and given that no defendant can "articulate to the district court the reasons why the delay should be regarded as materially prejudicial," the Court should deny and dismiss the motions to dismiss and the motion for a new trial. *Burke*, 571 F.3d at 1056.

Accordingly, because the defendants cannot show that the United States failed to disclose any exculpatory information, the defendants cannot meet their burden to show that there's been any *Brady* violation. Moreover, because the defendants cannot "articulate to the district court the reasons why the delay should be regarded as materially prejudicial," even if there were some *Brady* violation, which there isn't, the Court should deny and dismiss the motions to dismiss and motions for new trial. *Burke*, 571 F.3d at 1056.

### e. Pretrial publicity

In a "trilogy of more recent cases, the Supreme Court has refined the application of *Irvin* [*v. Dowd*, 366 U.S. 717 (1961)] to claims of biased jury pools." *Goss v. Nelson*, 439 F.3d 621, 629 (10th Cir. 2006).

> In the first case, *Murphy v. Florida*, [421 U.S. 794 (1975)], the Court rejected a presumed prejudice claim because the largely factual publicity in the record appeared several months before trial and its effect on jury selection appeared to be relatively modest:  the trial court excused for cause only twenty of seventy-eight potential jurors due to an opinion as to the defendant's guilt. *Id.* at 802-03. Similarly, in *Patton v. Yount*, [467 U.S. 1025 (1984)], the Court declined to find presumed prejudice even where (1) pretrial publicity revealed inadmissible information such as defendant's prior conviction for murder and his confession; (2) over three quarters (77%) of potential jurors admitted they would carry an opinion as to defendant's guilt into the jury box; and (3) eight of the fourteen jurors and alternates actually seated admitted that, at some time, they had formed an opinion as to the defendant's guilt. *Id.* at 1029-30.  The Court found that even daily coverage of the voir dire was not critical since it was "purely factual" and since there was no "barrage of inflammatory publicity immediately prior to trial."

> *Id.* at 1032-33. Finally, in *Mu'Min v. Virginia*, 500 U.S. 415 (1991), the Court
> discounted claims of media coverage even where eight of twelve seated jurors had
> read or heard something about the case prior to trial.

*Goss*, 439 F.3d at 629. The Court in *Goss* concluded "that while substantial 'adverse

pretrial publicity can create a presumption of prejudice in a community that the jurors'

claim that they can be impartial should not be believed, . . . they do not stand for the

proposition that juror exposure to . . . news accounts of the crime with which [the

defendant] is charged alone presumptively deprives the defendant of due process." *Id.* at

629-30 (internal quotes and citations omitted).

      Finally, in interpreting this precedent, the Tenth Circuit noted in the Oklahoma City

bombing case, where media scrutiny was at its zenith, the following:

> [I]n order for the reviewing court to reach a presumption that inflammatory
> pretrial publicity so permeated the community as to render impossible the seating
> of an impartial jury, the court must find that the publicity in essence displaced the
> judicial process, thereby denying the defendant his constitutional right to a fair
> trial.

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998). In those circumstances, "we simply

cannot rely on 'jurors' claims that they can be impartial' and [must] declare the publicity to be

prejudicial as a matter of law." *Id.* at 1182 (quoting *Patton*, 467 U.S. at 1031). But, as the court

also noted in *McVeigh*, "despite the proliferation of the news media and its technology, the

Supreme Court has not found a single case of presumed prejudice in this country since the

watershed case of *Sheppard*" in 1966. *Id.*

      The Court should deny the new trial request based on pretrial publicity for at least two

reasons: 1) numerous jurors were screened and dismissed before trial based on their answers to

jury questionnaires that addressed, among other things, prospective jurors' knowledge, feelings,

and beliefs about the case, and 2) the Court and the parties addressed any additional concerns during *voir dire*.

The defendants requested that a jury questionnaire ("Quest.") be sent to prospective jurors before the jurors appeared in court for *voir dire*.  The questionnaire was in addition to the Court's standard *voir dire* questionnaire that jurors fill out for jury service.  The extended questionnaire addressed topics such as:

whether jurors, their friends, or acquaintances worked in security or investigative services (Quest. p.4), whether jurors, their relatives, friends or acquaintances ever worked in a prison, jail, detention center or for probation services (Quest. p.4), how jurors kept up with the news (Quest p.6), which newspapers jurors read, either in print or on line (Quest p.6), which parts of the newspaper jurors read regularly (Quest p.6), whether jurors regularly listened to or watched any radio or television news or talk shows (Quest p.6), what Internet or web sites jurors frequented (Quest p.6), whether street gangs were problem in jurors' neighborhoods (Quest p.7), what jurors read or heard about gang involvement in drugs in New Mexico (Quest p.7), what jurors read or heard about gang activity in New Mexico (Quest p.7), what gangs jurors had heard of (Quest p.7), whether jurors or people they knew had been affected by gang activity (Quest p.7), whether jurors knew anyone who served time in a New Mexico prison or jail (Quest p.9), what jurors had seen, read, or heard about gangs in prison (Quest p.10), whether jurors believed in the presumption of innocence for inmates being prosecuted for crime while incarcerated (Quest p.10), whether jurors believed it should be easier to convict an inmate (Quest p.10), what movies, books, or TV programs about violent crime, the criminal justice system, prison life, or gang activity interested jurors (Quest p.12), what criminal cases jurors followed in the news (Quest p.12), whether jurors had concerns about convicting the defendants and whether they feared retaliation if they voted guilty (Quest p.13), whether, in a trial with multiple defendants who are alleged gang members, jurors could judge each defendant individually (Quest p.13), whether jurors had read, seen, or heard anything about the SNM case and through which sources they heard the information (Quest p.15), for those who had heard of the case, what stood out most in their minds about the case, how they reacted to the news, and what they last read, saw, or heard about the case (Quest p.15), whether jurors were involved or knew anyone involved with the events charged in this case (Quest p.15), whether jurors believed gang members should be legally responsible for the actions that other gang members commit on orders from gang leaders (Quest p.16), how jurors might react to graphic material presented as evidence (Quest p.16), whether jurors agreed that every juror was entitled to hold his or her opinions and whether differences in opinions should be respected (Quest p.17),

whether there was any matter which might interfere with jurors' duty to listen and keep an open mind about the evidence (Quest p.18), and many others.

As the Court is well aware, the parties agreed to dismiss many potential jurors before jury selection began. This process allowed the parties to address many concerns about the prospective jurors long before they were called to service in court. Obviously, one of those concerns was pretrial publicity and how that publicity affected the jury pool. Consequently, the pool of people who actually came to court to engage in the *voir dire* process represented a much more objective and untainted group, a group that was pre-screened for biases resulting from media coverage of the case.

The remainder of that initial pool of prospective jurors presented themselves in court where both the Court and the parties questioned them at length. The Court and the parties spent almost two days questioning jurors before the jury was selected. All involved did such a thorough job that, despite the fact that additional potential jurors were waiting, the jury was selected from the first group. Consequently, the facts of this case nowhere resemble the facts referenced above in *Murphy*, *Patton*, *Mu'Min*, and, of course, *McVeigh*.

Furthermore, the defendant complains about the Albuquerque Journal article that was published on the eve of trial. Among other things, the defendant highlights that the article referenced the fact that some defendants brought weapons to court; the Marshals Service considered the trial a high risk trial; and gang members wanted to hit one another. Doc. 2408, at 51. What the defendant neglects to mention is that he and the rest of the members of the joint defense team brought out these fact, and more, during the trial itself. Mario Rodriguez is just one example of a witness who was impeached with the following: he brought weapons to court; he considered murdering two of his co-defendants (Mauricio Varela and Carlos Herrera); he not only considered murdering Varela, but he contemplated doing it in court; and he was impeached

with a video showing him violently stabbing another inmate, Esparza, who shorted him for a

drug debt.  The newspaper article paled in comparison to the impeachment evidence introduced

by the defendants, so it can hardly be said to have risen to the level required to meet the

standards for unduly prejudicial publicity or a new trial.  Moreover, it was the defendants who

requested a state-wide jury panel.  So they, in essence, invited to the trial a larger pool of people

who could have been exposed to the increased publicity from the northern part of the state.

Finally, the defendant argues that a passing comment by Agent Acee contributed to

problems already created by pretrial publicity. The defendants requested a mistrial following the

statement, and the Court denied the request. The Court's refusal to grant a mistrial is reviewed

for abuse of discretion.  *United States v. Kravchuk*, 335 F.3d 1147, 1154 (10th Cir. 2003).  The

district court has discretion to grant a mistrial only when a defendant's right to a fair and

impartial trial has been impaired.  *Id.* at 1155.  *See also United States v. Laymon*, 621 F.2d 1051,

1053 (10th Cir. 1980) ("Whether a motion for mistrial should be granted is within the discretion

of the trial judge because he is in the best position to evaluate the effect of the offending

evidence on the jury.")  "[M]otions for mistrial . . . call for an examination of the prejudicial

impact of an error or errors when viewed in the context of the entire case."  *United States v.

Gabaldon*, 91 F.3d 91, 93-94 (10th Cir. 1996) (internal quotations and citations omitted).

As noted above, the pretrial publicity in this case does not warrant a new trial. Neither

does Agent Acee's comment that "Two of the gentlemen in court were charged with that as

well."  Bryan Acee, 1/31/18 Tr. at 93, *See* Bryan Acee's Tr. at 93-109 and 268-270, attached as

Exhibits 14 and 15, respectively.   There was never an indication who else was charged with a

RICO conspiracy, and it was not clear whether that statement could have referred to the pending

charges related to the January trial (Trial 1) because there were in fact RICO-type conspiracies the jury was considering.

Later testimony minimized the effects of the statement further.  A short time after the initial statement by Agent Acee he was asked, "Now, Agent Acee, you had earlier talked about the use of informants.  And as a result of the use of informants, can you tell the members of the jury whether Mr. Herrera and Mr. Perez were added to the Molina murder?"  His response was, "Yes, they were."  Bryan Acee, 1/31/18 Tr. at 97. *See* Exhibit 14.  He was also asked, "Now, referring to other charges with these defendants, we continue to say "the Molina murder," but is there more than one charge to include a conspiracy to murder?"  Agent Acee's response was, "Yes."  *Id.* at 98.  Later testimony and arrest photographs revealed that Perez and Herrera was added to the indictment as part of what was called "Phase 2" of the investigation.  *Id*. at 106. Finally, Agent Acee was asked, "I mentioned another indictment earlier.  Is it fair to say that in the first indictment, Mr. Sanchez and Mr. Baca were named when this was first charged."  Agent Acee's response was, "Yes."  This was followed by the next question and answer:  "And then when it was charged a second time, were they renamed in that indictment added these two defendants?  Yes." *Id*. at 108-109. *See* Exhibit 14.

The Court properly denied the motion for mistrial following the initial comment by Agent Acee.  The Court should also deny the motion for new trial when looking at the totality of the record. *See United States v. Race*, 505 Fed.Appx. 719, 2012 WL 6119886 *4 (10th Cir. 2012) (citing *United States v. Meridyth*, 364 F3d. 1181, 1183 (10th Cir. 2004).

The totality of the record clearly established that the right to a fair and impartial trial was not impaired.  This is true even when looking at the record close in time to the statement about which the defendant complains:

MR. CASTELLANO:  And Your Honor, I cleaned it up a little bit because I talked about the first indictment and the second indictment and the first two, Mr. Baca and Mr. Sanchez, being named in the previous indictment.  So I tried to gloss over that and clean it up by saying they had been named in another indictment related to this case.

THE COURT:  And Mr. Villa did it with his.  And so, you know, there are just so many discussions of cases and charges that are being thrown at the jury at the very beginning.  I just don't think it's a serious problem.

Bryan Acee, 1/31/18 Tr. at 270. *See* Exhibit 15. Furthermore, this was a situation where the defendants did not object contemporaneously with the statement and did not seek a curative instruction.  The result may be review for plain error only. Regardless, the Court should deny the defendant's new trial request.

**IV.**     **The defendant is not entitled to a hearing on his motion**

The Court should deny the defendant's motion without the need for a hearing. "[A] district court is not required to hold an evidentiary hearing before resolving a motion for a new trial, particularly when the record is complete or the petitioner raised only legal claims that can be resolved with the taking of additional evidence."  *United States v. Velarde*, 485 F.3d 553, 559 (10th Cir. 2007) (citations and quotations omitted).  The district court is required to conduct an evidentiary hearing "only if the admissible evidence presented by petitioner, if accepted as true, would warrant relief as a matter of law."  *Id.* at 560.

**V.**     **Conclusion**

When reviewing the evidence, both direct and circumstantial, in the light most favorable to the government, and without weighing conflicting evidence or considering the credibility of witnesses, the Court should again deny the defendant's Rule 29 motion. Furthermore, the verdict in this case is not contrary to the weight of the evidence such that a miscarriage of justice may have occurred. In fact the weight of the evidence weighs heavily in favor of upholding the

27

verdict. Not only does the defendant fail to meet his burden under a weight of the evidence standard, he falls woefully short based on a plain error standard for those subjects to which he failed to object at trial. Therefore, the United States respectfully requests that the Court deny the Motion and do so without the need for a hearing.

Respectfully Submitted,

FRED FEDERICI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. §515

***Electronically filed on 11/8/18***
MARIA Y. ARMIJO
RANDY M. CASTELLANO
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
RANDY M. CASTELLANO
Assistant United States Attorney